No. 24-10900

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

X CORP.,

*Plaintiff-Appellee,*

v.

MEDIA MATTERS FOR AMERICA, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas
No. 4:23-cv-01175-O
Hon. Reed O' Connor, District Judge

## BRIEF OF *AMICUS CURIAE* FIGHT FOR THE FUTURE IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL OF THE DISTRICT COURT ORDER ON A MOTION TO COMPEL DISCOVERY

Alejandra Caraballo
Harvard Cyberlaw Clinic
1557 Massachusetts Ave
Lewis Center, 4th Fl
Cambridge, MA 02138
(617) 384-8511
acaraballo@law.harvard.edu

*Counsel* for Amicus Curiae

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Defendants-Appellants' Certificate of Interested Persons— the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus Curiae***
Fight for the Future

***Attorney for Amicus Curiae***
Alejandra Caraballo
Harvard Cyberlaw Clinic

No publicly traded company has an ownership interest of 10% in any of the entities listed above.

Respectfully submitted,

/s/ Alejandra Caraballo
_____
Alejandra Caraballo
*Counsel of Record Amicus Curiae*
*Fight for the Future*

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................1

SUMMARY OF ARGUMENT ...............................................................................1

ARGUMENT ........................................................................................................3

I.  X Corp.'s Overbroad Discovery Requests Will Harm Researchers, Media
    Organizations, and Journalists, and Chill Their Speech. ....................................3

    A.    Legal attacks by X Corp. chill the speech of media organizations,
    researchers, and academics. ...........................................................................5

    B.    X Corp's. legal attacks threaten the existence and speech of
    organizations critical of powerful companies..................................................12

II. X Corp. Gives the Appearance of Divisional Judge Shopping ..........................15

III. The District Court's Order Compelling Discovery of Media Matters' Donor
     Information Was an Abuse of Discretion and Should Be Reversed. .................21

    A.    Donor information is irrelevant to X's claim and the order was
    disproportionate. ...........................................................................................22

    B.    Media Matters' First Amendment rights will be infringed upon by
    forcing production of donor information.........................................................23

IV. CONCLUSION ................................................................................................27

CERTIFICATE OF COMPLIANCE.....................................................................29

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING ...............................30

# TABLE OF AUTHORITIES

## Cases

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)); .......................................................................21

*Fannie Mae v. Hurst*,
    613 Fed. Appx. 314 (5th Cir. 2015)....................................................22

*Hernandez v. City of El Monte,*
    138 F.3d 393 (9th Cir. 1998) ..............................................................20

*Marceaux v. Lafayette City-Par. Consol. Gov't.*,
    731 F.3d 488 (5th Cir. 2013) ..............................................................21

*Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM),
    2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024) ............................4

*Media Matters for Am. v. Paxton,* No. 24-CV-147 (APM),
    2024 WL 1773197 at *18 (D.D.C. Apr. 12, 2024)...............................4

Motion to Compel, *X Corp. v. Media Matters for America,*
    No. 4:23-cv-01175-O (N.D. Tex. Jun 17, 2024) ...............................18

*Sierra Club v. Energy Future Holdings Corp.*,
    2013 WL 12244352 (E.D. Tex., Dec. 30, 2013). ........................ 24, 25

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC,*
    581 U.S. 258 (2017).............................................................................19

*Whole Woman's Health v. Smith,*
    896 F.3d 362 (5th Cir. 2018), as revised (July 17, 2018)..................21

*X Corp. v. Ctr. for Countering Digital Hate, Inc.,*
    724 F. Supp. 3d 948, 955 (N.D. Cal. 2024)..........................................5

*X Corp. v. Media Matters for Am.*,
    2023 WL 8091661 (N.D. Tex.) .............................................................3

*X Corp. v. World Fed'n of Advertisers*,
    7:24-CV-00114 (N.D. Tex.) ......................................................... 3, 14

*Young Conservatives Found. v. Univ. of N. Tex.,*
2022 WL 2901007, 2 (E.D. Tex., Jan. 11, 2022) ...............................23

**Statutes**

28 U.S.C. § 455 ..................................................................................18

28 U.S.C. § 455(b)(1) .........................................................................18

Tex. Civ. Prac. & Rem. Code §§ 27.001 ..............................................5

**Other Authorities**

Alex Botoman, *Divisional Judge-Shopping,* 49 Colum. Human Rights L. Rev. 297,
305 (2018) ................................................................................ 17, 20

Blair Currie, *Social Media Companies Could Be Threatened By Their Own Success
—How To Stimulate Growth And Innovation*, Forbes (Dec. 26, 2022).............15

Bobby Allyn, *New Records Show Texas Judge on X Case Didn't Sell His Tesla
Shares After Taking the Suit,* NPR (Oct. 17, 2024) ...........................17

Cass R. Sunstein, #Republic: Divided Democracy in the Age of Social Media
(2017) .............................................................................................15

Daniel Murphy & Lee Moerman, *SLAPPing accountability out of the public
sphere*, 31 ACCT., AUDITING & ACCOUNTABILITY J., 1774, 1775–77, 1784–85
(2018) ..............................................................................................6

David Keating, *Estimating the Cost of Fighting a SLAPP in a State with No Anti-
SLAPP Law*, Institute for Free Speech (June 16, 2022) ......................6

Donie O'Sullivan, *Former Top Twitter Official Forced to Leave Home Due to
Threats amid 'Twitter Files' Release | CNN Business*, CNN (December 12,
2022) ...............................................................................................25

Elon Musk (@elonmusk), *"Media Matters" is evil incarnate*, X (Oct. 31, 2024,
11:34 AM)..........................................................................................8

Elon Musk (@elonmusk), *Having seen the evidence unearthed today by Congress,
X has no choice but to file suit against the perpetrators and collaborators in the
advertising boycott racket. Hopefully, some states will consider criminal
prosecution.*, X (Jul. 11, 2024, 7:22 AM)...........................................13

iv

Elon Musk (@elonmusk), *I strongly encourage any company who has been systematically boycotted by advertisers to file a lawsuit. There may also be criminal liability via the RICO Act.* X (Aug. 6, 2024, 11:55 AM)......................3

Elon Musk (@elonmusk), *I strongly encourage any company who has been systematically boycotted by advertisers to file a lawsuit. There may also be criminal liability via the RICO Act.*, X (Aug. 6, 2024, 11:55 AM)....................13

Elon Musk (@elonmusk), *I'm not surprised to hear that. Media Matters is evil to its core.*, X (Feb. 27, 2024, 1:46 PM) ...................................................8

Elon Musk (@elonmusk), *Interesting. 𝕏 will add them as defendants in the lawsuit.* X (Jan. 5, 2024, 6:59 PM) ........................................................9

Elon Musk (@elonmusk), *Matt Gaetz has 3 critical assets that are needed for the AG role: a big brain, a spine of steel and an axe to grind. He is the Judge Dredd America needs to clean up a corrupt system and put powerful bad actors in prison. Gaetz will be our Hammer of Justice.*, X (Nov. 19, 2024, 1:59 AM)10

Elon Musk (@elonmusk), *Media Matters is an evil organization*, X (Nov. 16, 2023, 9:04 PM) ........................................................................8

Elon Musk (@elonmusk), *Media Matters is pure evil*, X (Nov. 20, 2023, 12:56 PM) ...........................................................................................26

Elon Musk (@elonmusk), *Much appreciated! Media Matters is doing everything it can to undermine the First Amendment. Truly an evil organization.* X (Mar. 25, 2024, 3:06 PM) ...................................................................4

Elon Musk (@elonmusk), *The split second court opens on Monday, X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company*, X (Nov. 18, 2023, 2:01 AM) .......................................................................................8

Elon Musk (@elonmusk), *Their board, their donors, their network of dark money, all of them …*, X (Nov. 18, 2023, 2:04 AM).......................................8

Elon Musk (@elonmusk), *This violates US criminal statutes against foreign interference in elections. We are going after CCDH and their donors. AND their donors.*, X (Oct. 22, 2024, 7:52 PM) ..........................................9

Freedom of the Press Found., *Media Matters layoffs underscore need to crack down on SLAPPs*, (May 24, 2024) ........................................................12

*Guarding Against The Chill: A Survival Guide for SLAPP Victims,* THE FIRST AMENDMENT PROJECT .............................................................................6

John G. Roberts, U.S. Sup. Ct., 2021 Year-End Report on the Federal Judiciary ..20

Jonas Anderson, *Judge Shopping in the Eastern District of Texas*, 48 Loy. U. Chi. L. J. 539 (2020) ......................................................................................19

Jud. Conf. of the U.S., Conference Acts to Promote Random Case Assignment, U.S. Courts (Mar. 12, 2024) ................................................................20

Judge Edith Jones, U.S. Court of Appeals for the Fifth Circuit, The Continued Independence of the Judiciary, Panel at the 2024 Federalist Society National Lawyers Convention (Nov. 14, 2024) .................................................26

Kat Abu (@abughazalehkat), *Bad News: I've Been Laid off from @mmfa, along with a Dozen Colleagues. Theres a Reason Far-Right Billionaires Attack Media Matters with Armies of Lawyers: They Know How Effective Our Work Is, and It Terrifies Them.,* X (May 23, 2024, 1:13 PM) ......................................13

Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. TIMES (Aug. 8, 2024) ......................................14

N.D. Tex. Special Order 3-344 (Sep. 14, 2022) ......................................17

Neal Milner, George W. Pring & Penelope Canan, *SLAPPs: Getting Sued for Speaking Out,* 31 Law & Society Review 823 (1997) ...........................6

Nikki McCann Ramirez, *Federal Employees Targeted By Elon Musk Face Barrage of Harassment*, Rolling Stone (Nov. 27, 2024) .................................11

O'Connor. N.D. Tex. Special Order 3-310 (Nov. 29, 2016) .........................17

Pl.'s Resp. to Mot. to Compel, X CORP. v. MEDIA MATTERS FOR AMERICA, July 8, 2024, 4:23-cv-01175-O U.S. Dist. Ct., N.D. Tex. (Fort Worth Div.) ....18

Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, REUTERS .............................................7

Special Order No. 3-343. District Court for the Northern District of Texas, Wichita Falls Division. ....................................................................................................16

Ted Johnson, *Media Matters For America Undergoes Round Of Layoffs*, DEADLINE (May 23, 2024) ....................................................................................12

Todd Spangler, *Don Lemon Quits X, Citing Elon Musk's Change to Move Legal Disputes to Texas Courts*, Variety (Nov. 13, 2024) ...........................................17

Ugur Aytac, *Digital Domination: Social Media and Contestatory Democracy*, 72 POL. STUD. 6 (2024) ...........................................................................................15

*World Federation of Advertisers discontinues small brand safety initiative after Elon Musk's X sues*, ASSOCIATED PRESS (Aug. 9, 2024) ...................................12

X, *Terms of Service* ................................................................................................16

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Fight for the Future is an organization composed of artists, engineers, activists, and technologists who harness the power of the Internet to channel outrage into action, defending our most basic rights in the digital age. Fight for the Future works to ensure that technology is a force for empowerment, free expression, and liberation rather than tyranny, corruption, and structural inequality.

## SUMMARY OF ARGUMENT

Freedom of speech and freedom of the press, as guaranteed by the First Amendment, are fundamental American values since the founding of this country. X Corp's retaliatory lawsuit against Media Matters for America (Media Matters) for exercising its free speech by engaging in critical journalism of its platform, is a repudiation of and contrary to those foundational values. Put simply, X Corp. seeks to punish Media Matters for daring to criticize its platform.

Under the cloak of various legal theories of contract interference, business disparagement, and interference with prospective economic advantage that X Corp have sought to allege against Media Matters, X Corp is fundamentally attempting to suppress Media Matters's speech, silence critics, and chill public discourse

---

[1] Amicus submits this brief with the consent of all parties. Fed. R. App. P. 29(a)(2). Amicus declares that no party or party's counsel authored the brief in whole or in part, and no one other than amicus, their members, or their counsel contributed money intended to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E).

about the X platform. This is not the first time that X Corp has filed a retaliatory lawsuit to undermine the principles of free speech. Last year, X Corp filed a lawsuit against the Center for Countering Digital Hate (CCDH) for publishing reports on hateful extremist content on the X platform. X Corp's lawsuit against Media Matters is a classic Strategic Lawsuit Against Public Participation (SLAPP) lawsuit, similar to the CCDH lawsuit. However, recognizing that California's anti-SLAPP statute would prevent X Corp from being successful in this litigation, they have attempted to circumvent California's anti-SLAPP statute by filing this case in the Northern District of Texas. The Northern District of Texas is a forum where X is neither incorporated nor headquartered, nor their primary place of business, yet X Corp chose this forum to avail themselves of the Fifth Circuit precedent that does not apply Texas' anti-SLAPP statute to federal litigation. Moreover, the selection of the Fort Worth division gives the appearance of divisional judge shopping for a favorable judge by X Corp.

More than winning in the court of law, X Corp has set their eyes on suppressing and instilling fear in their critics. Their strategy involves reducing the financial backing of their critics by intimidating the donors of any organization that criticizes them and harassing them with frivolous SLAPP suits. X's discovery request for the donor list of Media Matters will only further those aims.

For the reasons set forth herein, amicus urges this Court to reverse the district court's ruling and grant, and thus dispose of X Corp.'s claims.

## ARGUMENT

### I.  X Corp.'s Overbroad Discovery Requests Will Harm Researchers, Media Organizations, and Journalists, and Chill Their Speech.

The concerns about this overbroad discovery request are not merely hypothetical as X Corp. has undertaken a significant lawfare campaign against its critics beyond Media Matters. Since the filing of the underlying matter in this case, X Corp. threatened to sue the Anti-Defamation League for criticizing X Corp.'s moderation of antisemitic content, sued CCDH for publishing multiple reports detailing hateful extremist content on its platform, and sued the World Federation of Advertisers ("WFA") along with several major companies for their reluctance to advertise on the X platform. *X Corp. v. Media Matters for Am.*, 2023 WL 8091661 (N.D. Tex.); *X Corp. v. World Fed'n of Advertisers*, 7:24-CV-00114 (N.D. Tex.). Musk has since publicly threatened more lawsuits and is encouraging others to file similar SLAPP lawsuits while wrongfully suggesting anyone refusing to advertise on his platforms could be held criminally liable under RICO.[2] More insidiously,

---

[2] Elon Musk (@elonmusk), *I strongly encourage any company who has been systematically boycotted by advertisers to file a lawsuit. There may also be criminal liability via the RICO Act.* X (Aug. 6, 2024, 11:55 AM), https://twitter.com/elonmusk/status/1820851090138505570 [https://perma.cc/FQ9L-JJMF].

state Attorneys General have answered his call and launched baseless politically motivated civil investigations into Media Matters that constituted First Amendment retaliation and have since been enjoined in federal court.[3] These state officials have answered the call from Elon Musk, who has explicitly asked for state Attorneys General to investigate his critics. *See Media Matters for Am. v. Paxton*, No. 24-CV-147 (APM), 2024 WL 1773197, at *3 (D.D.C. Apr. 12, 2024) ("Defendant talked to the press about the investigation. He told Newsmax that his office had learned about the controversy from Musk's lawsuit and press accounts. … Defendant said on CNBC that he had initiated the investigation because of the 'information' that Media Matters had reported about X. … On a podcast called 'The Benny Show,' Defendant 'encouraged' Attorneys General of both political parties to look into Media Matters' reporting…") (citations omitted). When they have done so, Musk has been sure to thank them.[4] These statements demonstrate a

---

[3] Both investigations by Missouri AG Andrew Bailey and Texas AG Ken Paxton have been blocked in court. *Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024) (finding that the "Defendant's investigation thus began with a political bent"); *Media Matters for Am. v. Paxton,* No. 24-CV-147 (APM), 2024 WL 1773197 at *18 (D.D.C. Apr. 12, 2024) (finding that "Defendant's investigation of Media Matters is [a] retaliatory action") (cleaned up).

[4] Elon Musk (@elonmusk), *Much appreciated! Media Matters is doing everything it can to undermine the First Amendment. Truly an evil organization.*, X (Mar. 25, 2024, 3:06 PM), https://x.com/elonmusk/status/1772339333673972131 [https://perma.cc/78SX-V5CC] (Replying to a tweet from Missouri AG Andrew Bailey announcing the suit against Media Matters)

vengeful attitude towards Musk's critics and a willingness to utilize his sizeable wealth and influence to act on it. Worse yet, these tactics are working.

## A.     Legal attacks by X Corp. chill the speech of media organizations, researchers, and academics.

The legal actions against Media Matters, and similar legal actions against other critics, have had a devastating chilling effect on speech. X Corp.'s lawsuit against Media Matters is a classic SLAPP suit as it is highly similar to X Corp.'s lawsuit against CCDH, blocked by California's anti-SLAPP statutes. *See X Corp. v. Ctr. for Countering Digital Hate, Inc.,* 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024) (dismissing X Corps.' lawsuit as a SLAPP suit). However, Fifth Circuit precedent does not apply Texas' anti-SLAPP statute, the Texas Citizen Participation Act ("TCPA"), to federal litigation. *Klocke v. Watson, 936 F.3d 240, 244-49 (5th Cir. 2019), as revised (Aug. 29, 2019)* (holding that because the TCPA's "burden-shifting framework imposes additional requirements beyond those found in Rules 12 and 56 and answers the same question as those rules, the state law cannot apply in federal court."); Tex. Civ. Prac. & Rem. Code §§ 27.001. Such suits are intended to have a broad silencing impact; rarely are the public participation rights of the defendant(s) at issue in any one controversy. As The First Amendment Project details:

"Most SLAPPs are ultimately legally unsuccessful. While most SLAPPs lose in court, they 'succeed' in the public arena. This is because defending a SLAPP, even when the legal defense is strong, requires a substantial investment of money, time, and resources. The resulting effect is a 'chill' on public participation in, and open debate on, important public issues. This 'chilling' effect is not limited to the SLAPP target(s): fearful of being the target of future litigation, others refrain from speaking on, or participating in, issues of public concern."[5]

Studies repeatedly demonstrate that SLAPP suits have a chilling effect on critics and organizations.[6] A study conducted on 167 academic and civil society researchers by the Coalition for Independent Technology Research showed that "a majority of survey respondents fear being sued by X Corp. over their findings or use of data." The report, authored with Reuters, directly cites the filing of the

---

[5] *Guarding Against The Chill: A Survival Guide for SLAPP Victims,* THE FIRST AMENDMENT PROJECT, https://www.thefirstamendment.org/media/Guarding-Against-the-Chill.pdf [https://perma.cc/W77N-JFKR].

[6] *See, e.g.*, Neal Milner, George W. Pring & Penelope Canan, *SLAPPs: Getting Sued for Speaking Out*, 31 Law & Society Review 823 (1997). ("[W]e conservatively estimate that thousands have been sued into silence, and that more thousands who heard of the SLAPPs will never again participate freely and confidently in the public issues and governance of their town, state, or country."); *see also* Daniel Murphy & Lee Moerman, *SLAPPing accountability out of the public sphere*, 31 ACCT., AUDITING & ACCOUNTABILITY J., 1774, 1775–77, 1784–85 (2018) (analysing the chilling effects of McDonalds' SLAPP lawsuits); David Keating, *Estimating the Cost of Fighting a SLAPP in a State with No Anti-SLAPP Law*, Institute for Free Speech (June 16, 2022), https://www.ifs.org/blog/estimating-the-cost-of-fighting-a-slapp-in-a-state-with-no-anti-slapp-law/ [https://perma.cc/UZH9-REF8].

6

lawsuit against CCDH as an explanation.[7] The report highlighted that the changes in X Corp.'s policies have resulted in "30 canceled projects, 47 stalled projects, and 27 where researchers changed platforms."[8] Bond Benton, an assistant professor at Montclair State University, explained that the "move against CCDH" showed that there was "intrinsic liability in publicly disseminating findings."[9]

Targeting donors particularly threatens media organizations, researchers, and academics, who often rely on donations and third-party funding to exist and operate. These groups will hesitate to act if they sense their financial backing is at risk due to litigation or public exposure. Donors would further retrain from funding any such research in the future, chilling the entire industry. X Corp's overbroad discovery request for donor information is meant to achieve exactly that fear and chilling effect. Musk's tweets amplify these concerns by demonstrating his animus towards Media Matters. Musk has posted several times labeling Media Matters

---

[7] Sheila Dang, *Exclusive: Elon Musk's X Restructuring Curtails Disinformation Research, Spurs Legal Fears*, REUTERS (Nov. 6, 2023), https://www.reuters.com/technology/elon-musks-x-restructuring-curtails-disinformation-research-spurs-legal-fears-2023-11-06/.

[8] *Id.*

[9] *Id.*

with inflammatory terms like "evil incarnate" and "pure evil," which are intended to delegitimize and vilify the organization and its backers.[10]

Musk escalates his rhetoric with legal threats, highlighting a "thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company," and explicitly stating that not only Media Matters but also its donors and supporters are his targets.[11] These tweets in particular demonstrate Musk's true desire to pursue the donors of Media Matters to intimidate and punish them. Even more aggressively, Musk, speaking in his role for X Corp., clearly intends to expose the identities of Media Matters's donors in order to bring SLAPP suits against them as well, as evidenced by his tweet stating, "X will add them as

---

[10] Elon Musk (@elonmusk), *Media Matters is an evil organization*, X (Nov. 16, 2023, 9:04 PM), https://x.com/elonmusk/status/1725333983808848059 [https://perma.cc/BT48-5FAF] ; Elon Musk (@elonmusk), *I'm not surprised to hear that. Media Matters is evil to its core.*, X (Feb. 27, 2024, 1:46 PM), https://x.com/elonmusk/status/1762549835406909781 [https://perma.cc/Y4NX-28M6] (writing that Media Matters is "evil to its core"); Elon Musk (@elonmusk), *"Media Matters" is evil incarnate*, X (Oct. 31, 2024, 11:34 AM), https://x.com/elonmusk/status/1852011217037979981 [https://perma.cc/7B42-MLVH].

[11] Elon Musk (@elonmusk), *The split second court opens on Monday, X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company*, X (Nov. 18, 2023, 2:01 AM), https://x.com/elonmusk/status/1725771191644758037 [https://perma.cc/2CFQ-T2JX]; Elon Musk (@elonmusk), *Their board, their donors, their network of dark money, all of them ...*, X (Nov. 18, 2023, 2:04 AM), https://x.com/elonmusk/status/1725771944467759573 [https://perma.cc/8DZ2-AN5B] (writing that he would go after Media Matters by going after "[t]heir board, their donors, their network of dark money, all of them …").

defendants in the lawsuit."[12] This implies a strategy to intimidate and discourage donors by threatening public exposure and SLAPP suits intended to silence his critics. Not content solely with civil litigation, Musk has also threatened criminal charges against other critics such as CCDH and their donors, stating "We [X. Corp] are going after CCDH and their donors. AND their donors" after accusing the organization of "violat[ing] US criminal statutes against foreign interference in elections."[13] Even more disturbing, Musk has also called for incoming President Donald Trump's withdrawn Attorney General nominee, Matt Gaetz, to serve as "the Judge Dredd America needs," referencing a dystopic comic book character that summarily arrests, convicts, sentences, and executes suspects, and calls on him "to clean up a corrupt system and put powerful bad actors in prison." [14] While

---

[12] Elon Musk (@elonmusk), *Interesting. 𝕏 will add them as defendants in the lawsuit.*, X (Jan. 5, 2024, 6:59 PM), https://x.com/elonmusk/status/1743422098679173291 [https://perma.cc/QT7L-6EYU] (responding to reports that the Washington Free Beacon had uncovered a confidential list of Media Matters' major contributors).

[13] Elon Musk (@elonmusk), *This violates US criminal statutes against foreign interference in elections. We are going after CCDH and their donors. AND their donors.*, X (Oct. 22, 2024, 7:52 PM), https://x.com/elonmusk/status/1848875059265605639 [https://perma.cc/KU46-FT5U].

[14] Elon Musk (@elonmusk), *Matt Gaetz has 3 critical assets that are needed for the AG role: a big brain, a spine of steel and an axe to grind. He is the Judge Dredd America needs to clean up a corrupt system and put powerful bad actors in prison. Gaetz will be our Hammer of Justice.*, X (Nov. 19, 2024, 1:59 AM)

Musk is not in a position to personally bring criminal charges, his role in advising the staffing of the incoming Trump administration certainly creates a possibility that a future US Attorney General could follow his directive in bringing bogus criminal charges against his critics much as state AG's in Texas and Missouri have brought meritless fraud investigations.

Taken together, such rhetoric and legal actions are designed to provoke fear among potential and existing donors, causing them to reconsider their support for Media Matters. Musk is urging his sizeable following of over 200 million followers to stand with X against Media Matters reinforces this environment of intimidation, fostering a climate where donors might be subjected to mass harassment online by Musk's followers.[15] The 5th Circuit, in issuing a stay pending appeal, also noted the "heavy burden" on Media Matters and its donors if required to provide donor information, specifically noting the potential of "others to harass or intimidate Media Matters or its donors" because of Musk's public statements. Order Granting Mot. for Stay Pending Appeal 11, ECF 48-1 (quoting Musk in stating that X Corp. would "pursue not just [Media Matters] but anyone funding

---

https://x.com/elonmusk/status/1858766986508927479 [https://perma.cc/DY2X-LWMU].

[15] *See supra* note 2.

that organization. I want to be clear about that anyone funding that organization, will be, we will pursue them."

The threat of being embroiled in a high-profile legal battle, combined with the fear of public vilification and harassment, could significantly deter donors from backing organizations like Media Matters going forward. Musk's own statements further raise doubts about his commitment to maintain any confidentiality of donor information, even if bound by discovery agreements or court orders to restrict the publication of such information. His remarks about publicizing Media Matters' donors' identities signal an intent to disregard protective measures, particularly given his stated commitment to add donors as defendants to his suits.[16] The statements fit within an existing pattern of behavior, in which Musk repeatedly pledges to investigate, sue, and target donors of critical organizations. The fear of having their identities exposed to a large corporation like X Corp. or any similar entity alone is sufficient to deter support, as Musk has shown a desire to use disclosure as a tool for pressure and intimidation.[17]

---

[16] *See supra* note 12.

[17] This was recently demonstrated by Musk's attacks on particular government employees that has resulted in a "barrage of harassment." Nikki McCann Ramirez, *Federal Employees Targeted By Elon Musk Face Barrage of Harassment*, Rolling Stone (Nov. 27, 2024), https://www.rollingstone.com/politics/politics-news/elon-musk-targets-federal-employees-harassment-doge-1235183987/.

### B. X Corp's. legal attacks threaten the existence and speech of organizations critical of powerful companies.

The lawsuits filed by X Corp. have already achieved significant success in silencing and harming its critics. In the wake of X Corp.'s lawsuit, and the investigations by the Texas and Missouri Attorneys General it prompted, Media Matters laid off a substantial portion of its workforce.[18] Media Matters President Angelo Carusone emphasized that in response to this "legal assault", the layoffs were required by the organization to maintain sustainability through a changing media landscape.[19] Similarly, days after X Corp.'s lawsuit against WFA alleging antitrust violations, WFA dissolved its Global Alliance for Responsible Media, an industry group dedicated to promoting digital safety by mitigating the harm of malicious content and disinformation.[20] Unfortunately, the intended effect of punishing X Corp.'s critics has thus far been successful.

---

[18] Freedom of the Press Found., *Media Matters layoffs underscore need to crack down on SLAPPs*, (May 24, 2024), https://freedom.press/news/media-matters-layoffs-underscore-need-to-crack-down-on-slapps/ [https://perma.cc/SWD2-YQ6G].

[19] Ted Johnson, *Media Matters For America Undergoes Round Of Layoffs*, DEADLINE (May 23, 2024), https://deadline.com/2024/05/media-matters-layoffs-elon-musk-1235929171/ [https://perma.cc/9UUC-EAEP].

[20] *World Federation of Advertisers discontinues small brand safety initiative after Elon Musk's X sues*, ASSOCIATED PRESS (Aug. 9, 2024) https://apnews.com/article/x-twitter-advertiser-lawsuit-garm-discontinues-e64b99a501d9f69abbeebc1c479688d7.

Since the retaliatory SLAPP suit was filed by X Corp., Media Matters has suffered severe consequences including having to furlough multiple staff members who took to social media to vent about the importance of their work and the opposition they've faced.[21] As evidenced by Media Matters, these retaliatory SLAPP suits can hinder the general public from getting information by causing brutal disruptions in organizations' and researchers' efforts to publicly critique X Corp.'s policies.

X Corp.'s most recent litigation against WFA indicates not only a willingness to punish critics but also to engage in retribution against advertisers that refuse to advertise on the X platform, which Musk falsely described as a cartel engaged in criminal actions that violate the "RICO Act" and other federal laws.[22]

---

[21] Kat Abu (@abughazalehkat), *Bad News: I've Been Laid off from @mmfa, along with a Dozen Colleagues. Theres a Reason Far-Right Billionaires Attack Media Matters with Armies of Lawyers: They Know How Effective Our Work Is, and It Terrifies Them.*, X (May 23, 2024, 1:13 PM), https://x.com/abughazalehkat/status/1793691841113805312 [https://perma.cc/F9GD-AALB].

[22] *See, e.g.*, Elon Musk (@elonmusk), *Having seen the evidence unearthed today by Congress, X has no choice but to file suit against the perpetrators and collaborators in the advertising boycott racket. Hopefully, some states will consider criminal prosecution.*, X (Jul. 11, 2024, 7:22 AM), https://x.com/elonmusk/status/1811360296218341403 [https://perma.cc/4LV3-QZ4K] (responding to congressional testimony of Ben Shapiro criticizing Media Matters); Elon Musk (@elonmusk), *I strongly encourage any company who has been systematically boycotted by advertisers to file a lawsuit. There may also be criminal liability via the RICO Act.*, X (Aug. 6, 2024, 11:55 AM), https://x.com/elonmusk/status/1820851090138505570 [https://perma.cc/FQ9L-

On August 6, 2024, X Corp. filed an antitrust action against WFA, Unilever, Mars, Inc., CVS Health Corporation, and Ørsted claiming that these organizations were engaged in an unlawful boycott against X Corp. *See* Complaint at 2; *X Corp. v. World Fed'n of Advertisers*, 7:24- CV-00114 (N.D. Tex.). WFA created the Global Alliance for Responsible Media ("GARM") in 2019 as a voluntary committee constituting leading advertisers to ensure consistent brand safety standards and minimize the harm of hate speech, misinformation, and disinformation. Within two days of X Corp.'s filing its lawsuit, WFA announced that it would be shutting down GARM with the chief executive of WFA stating the "decision was not made lightly, but GARM is a not-for-profit organization, and its resources are limited."[23] Given the filing in the Northern District of Texas, similar to Media Matters, WFA was unable to avail itself of anti-SLAPP protections in federal court, highlighting the importance of such protections to defend against frivolous suits seeking to silence critics.

---

JJMF] (encouraging "any company who has been systematically boycotted by advertisers to file a lawsuit" and suggesting "criminal liability via the RICO Act").

[23] Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. TIMES (Aug. 8, 2024), https://www.nytimes.com/2024/08/08/technology/elon-musk-x-advertisers-boycott.html [https://perma.cc/W2VZ-8LFW].

Social media companies like X Corp. are among the most valuable, influential, and powerful companies on the planet.[24] The public benefits from having a healthy robust debate on disinformation, hate speech, and how social media platforms handle these issues. The public loses when a debate is stifled through meritless lawsuits designed to intimidate journalists and researchers from being able to independently research disinformation and hate speech on X or other social media platforms. Such legal attacks undermine core First Amendment principles tied to freedom of speech, freedom of the press, and freedom of association and pose a threat to not just individual researchers, but to organizations across ideological spectra, from non-profits to PACs.

## II.    X Corp. Gives the Appearance of Divisional Judge Shopping

A fundamental principle of the judiciary system is that plaintiffs, especially the wealthy and powerful should not be able to pick their own judges. X Corp's choice to file this case in the Northern District of Texas (Fort Worth division) is notable as neither X Corp. nor Media Matters are incorporated, headquartered, or

---

[24] *See, generally*, Blair Currie, *Social Media Companies Could Be Threatened By Their Own Success —How To Stimulate Growth And Innovation*, Forbes (Dec. 26, 2022), https://www.forbes.com/councils/forbestechcouncil/2022/12/26/social-media-companies-could-be-threatened-by-their-own-success-how-to-stimulate-growth-and-innovation/ [https://perma.cc/JX27-765Y] (discussing value); Cass R. Sunstein, #Republic: Divided Democracy in the Age of Social Media (2017). (discussing impact on modern politics and democracy); Ugur Aytac, *Digital Domination: Social Media and Contestatory Democracy*, 72 POL. STUD. 6 (2024) (discussing domination of communication channels and political participation).

have their primary place of business in the Northern District of Texas. X Corp. is

incorporated in Nevada, was headquartered in San Francisco, California when this

case commenced, and is currently headquartered in the Western District of Texas

(Bastrop, Texas), while Media Matters is based out of Washington D.C. Yet, X

Corp. still saw fit to file a case in N.D. Tex. However, this is not a one-off

incidentas this year, X Corp. also filed an antitrust action against the World

Federation of Advertisers and other defendants in the Northern District of Texas,

Wichita Falls Division. *X Corp v. World Federation of Advertisers,* 7:24-cv-00114,

U.S. Dist. Ct. for the N.D. Tex., Wichita Falls Div. (Aug 6. 2024) (Complaint).

Given the timing after favorable rulings towards X Corp. in the instant case, this

seems like a transparent attempt by X Corp. to ensure that future cases involving X

Corp. are exclusively heard by Judge Reed O'Connor.[25] X's Terms of Service,

which were recently updated and took effect on November 15, 2024 reinforce this

perception that X Corp. is seeking to ensure all matters are heard by the judge of its

choosing. The updated Terms of Service forum selection clause requires all

disputes and cases involving X Corp. and its users to be brought "exclusively in the

U.S. District Court for the Northern District of Texas or state courts located in

---

[25] Cases brought in the Wichita Falls division are nearly guaranteed to be assigned
to Judge Reed O' Connor as the standing special order in the Northern District
requires assignment of new cases to him. Special Order No. 3-343. District Court
for the Northern District of Texas, Wichita Falls Division.
https://www.txnd.uscourts.gov/sites/default/files/orders/3-343.pdf.

16

Tarrant County, Texas, United States".[26] This change along has resulted in high

profile users to depart the X platform due to concerns about the fairness of

litigation brought in the Northern District by X. Corp.[27] The change in the Terms

of Service suggests X Corp. is attempting to ensure that they are able to select their

own judges, which fundamentally erodes public confidence in the judiciary. What

makes the Northern District of Texas a prime location for this form of judge

shopping is that the choice of division within that district can provide a plaintiff a

near-total certainty of the judge that will be presiding in this case.[28]

Beyond the concerns of divisional judge shopping, there appears to be

immediate conflicts of interest by Judge Reed O'Connor, who owns up to $50,000

Tesla stock, and his 2023 financial disclosure reveals that he actively trades Tesla

stock.[29] While Tesla is not X Corp., both are run and predominantly owned by

---

[26] X, *Terms of Service*, https://x.com/en/tos [https://perma.cc/8J6Q-8GFU].

[27] Todd Spangler, *Don Lemon Quits X, Citing Elon Musk's Change to Move Legal Disputes to Texas Courts*, Variety (Nov. 13, 2024), https://variety.com/2024/digital/news/don-lemon-quits-x-elon-musk-legal-disputes-texas-courts-1236209140/.

[28] Alex Botoman, *Divisional Judge-Shopping,* 49 Colum. Human Rights L. Rev. 297, 305 (2018). A case filed in the Wichita Falls Division has an 85% probability of drawing Judge Reed O'Connor. N.D. Tex. Special Order 3-310 (Nov. 29, 2016). Similarly, any cases filed in the Amarillo Division will be assigned to Judge Matthew Kacsmaryk. N.D. Tex. Special Order 3-344 (Sep. 14, 2022).

[29] Bobby Allyn, *New Records Show Texas Judge on X Case Didn't Sell His Tesla Shares After Taking the Suit,* NPR (Oct. 17, 2024),

17

Elon Musk. In this case, Media Matters had moved to compel X to list Tesla as one of the parties financially interested in this case. Motion to Compel, *X Corp. v. Media Matters for America,* No. 4:23-cv-01175-O (N.D. Tex. Jun 17, 2024). In response, X asserted in a court filing that any connection between Tesla and X is "tenuous and speculative at best". Pl.'s Resp. to Mot. to Compel, X Corp. v. Media Matters for America, July 8, 2024, 4:23-cv-01175-O U.S. Dist. Ct., N.D. Tex. (Fort Worth Div.).[30] But that fundamentally misses the point. Judicial practice has indicated that judges should recuse themselves anytime there is appearance of bias. In fact, 28 U.S.C. § 455 requires all federal judges to recuse themselves from cases under circumstances where their "impartiality might be questioned". 28 U.S.C. § 455(b)(1); 28 U.S.C. § 455(b)(4). In a Supreme Court case, the majority opinion stated that in assessing claims of recusal, "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States,* 510 U.S. 540, 548 (1994). In the same case, Justice Kennedy had remarked that "One of the very objects of law

---

https://www.npr.org/2024/10/16/g-s1-28620/texas-judge-elon-musk-x-case-tesla-shares#:~:text=In%20August%2C%20NPR%20reported%20that,X%2C%20his%20social%20media%20site [https://perma.cc/9U5E-DHBW].

[30] During the takeover of Twitter (X), Tesla employees were roped in immediately for code review and for other tasks associated with maintaining the social network, making the claim asserted by X questionable. Lora Kolodny, *Elon Musk Has Pulled More Than 50 Tesla Engineers into Twitter,* CNBC (Oct. 31, 2022), https://www.cnbc.com/2022/10/31/elon-musk-has-pulled-more-than-50-tesla-engineers-into-twitter.html.

is the impartiality of its judges in fact and appearance." *Id.* at 558 (Kennedy, J., concurring). Therefore, Judge O'Connor's ownership of a significant amount of Tesla stock certainly gives the appearance of a lack of impartiality.

The practice of divisional judge shopping undermines faith in the judiciary, and many have sought to call for its end.[31] This is not unique to this particular situation. This practice was a significant problem with patent cases in the Eastern District of Texas, where a disproportionate number of the patent cases in the US landed in Judge Gilstrap's courtroom.[32] This proved to be such a big issue that the Supreme Court acted to reduce it by holding that the patent venue statute was not as permissive regarding the residence of the corporation as lower courts had assumed. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC,* 581 U.S. 258, 261–62 (2017). Soon after, this led to a precipitous drop in patent cases filed in the Eastern District of Texas.[33]

---

[31] Robert Lawless, *Bankruptcy Venue Shopping Breaks Perceptions of Judicial Fairness,* Bloomberg Law (June 26, 2024), https://news.bloomberglaw.com/us-law-week/bankruptcy-venue-shopping-breaks-perceptions-of-judicial-fairness ("A rich social-science literature shows people care who wins or loses a case, but they also care a whole lot about how the court arrived at its decision. People who believe a process was fair are much more likely to view a decision they don't like as legitimate and comply with it.").

[32] Jonas Anderson, *Judge Shopping in the Eastern District of Texas*, 48 Loy. U. Chi. L. J. 539 (2020).

[33] Malathi Nayak & Peter Leung, *Ruling Court Halt Drop in Texas Court Patent Complaint Filings,* Bloomberg L. (July 10, 2017),

In at least eighty-one divisions, spread across thirty district courts, one or two judges hear all the division's cases.[34] Courts and legal academics have condemned this practice. *Hernandez v. City of El Monte,* 138 F.3d 393, 403 (9th Cir. 1998) ("Judge-shopping doubtless disrupts the proper functioning of the judicial system and may be disciplined.").[35] In the 2021 Year-End Report on the Federal Judiciary, Chief Justice Roberts expressed concerns about judicial assignment of cases in federal courts.[36] The concerns regarding divisional judge shopping became so apparent that the Judicial Conference recently strengthened the policy on random assignment of cases within the same district.[37] However, the

---

https://www.bloomberglaw.com/bloomberglawnews/ip-law/X4L61V48000000?bna_news_filter=ip-law#jcite

[34]Alex Botoman, *Divisional Judge-Shopping,* 49 Colum. Human Rights L. Rev. 297, 319 (2018).

[35] *Id.*; *see* also Scott William Dodson, *Culture of Forum Shopping in the United States,* American Bar Association (Jun 5. 2024), https://www.americanbar.org/groups/international_law/resources/international-lawyer/57-2/culture-of-forum-shopping-united-states/.

[36] John G. Roberts, U.S. Sup. Ct., 2021 Year-End Report on the Federal Judiciary 5 (2021), https://www.supremecourt.gov/publicinfo/year-end/2021year-endreport.pdf [https://perma.cc/7G26-V3EU] (writing that reconciling the values of random assignment of cases with Congress intentionally shaping courts into districts and divisions "is important to public confidence in the courts.")

[37] Jud. Conf. of the U.S., Conference Acts to Promote Random Case Assignment, U.S. Courts (Mar. 12, 2024), https://www.uscourts.gov/news/2024/03/12/conference-acts-promote-random-case-assignment.

Northern District of Texas notably refused to adopt this policy which would change the way in which judges are assigned to cases.[38]

## III. The District Court's Order Compelling Discovery of Media Matters' Donor Information Was an Abuse of Discretion and Should Be Reversed.

When a discovery ruling raises First Amendment issues, an appellate court must conduct a *de novo* review of the entire record to ensure the discovery ruling does not infringe on the freedom of expression. *Marceaux v. Lafayette City-Par. Consol. Gov't.*, 731 F.3d 488, 490 (5th Cir. 2013) (holding that "in cases raising First Amendment issues ... an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" quoting *Bose Corp. v. Consumers Union of U.S., Inc*., 466 U.S. 485, 499 (1984)); *see* also *Whole Woman's Health v. Smith*, 896 F.3d 362, 368 (5th Cir. 2018), as revised (July 17, 2018).  X's discovery request infringes on the same First Amendment rights at issue in *Lafayette*; the ability to share criticism online. When looking at the entire record, the discovery order fails to be relevant and proportionate to the nature of the case. Even if it were, it raises such serious First Amendment concerns that the court should overturn the order. By enforcing X's

---

[38] Tierney Sneed, *Judge Shopping in the Northern District of Texas,* CNN (Apr. 2, 2024), https://www.cnn.com/2024/04/01/politics/judge-shopping-northern-district-texas/index.html [https://perma.cc/DP5M-6YVY].

discovery order, press organizations like Media Matters may refrain from engaging in criticizing large tech companies for fear of losing donors and being buried in onerous legal costs.

### A. Donor information is irrelevant to X's claim and the order was disproportionate.

While a trial judge's control of discovery is granted great deference, parties may only obtain discovery if their request aligns with Federal Rules of Procedure 26(b)(1)'s standards of relevancy and proportionality to that party's claim or defense. *See Fannie Mae v. Hurst*, 613 Fed. Appx. 314, 317 (5th Cir. 2015); FED. R. CIV. P. 26(b)(1). In *Fannie Mae*, discovery of Fannie Mae's possible home foreclosures throughout a general region was irrelevant to Hurst's claim because the only question was whether one particular property was sold at fair market value: "various factors influencing the market as a whole were simply not at issue." *Id.* X's discovery requests for Media Matters' donor information are even more disconnected from its claim than those in *Fannie Mae*. The *Fannie Mae* court determined that "even if Fannie Mae's other foreclosures did in fact depress the value" of the property in question, the only relevant question was whether the property was sold at fair market value; "evidence of the various market forces influencing [the property's] value" was not relevant. *Id* at 317-18. Here, the names and addresses of Media Matters' donors bear no relevance to X's claim that Media Matters manipulated its platform. Even if Media Matters' funding sources

influenced its journalistic priorities as X claims, those influences do not affect

whether, in this case, Media Matters manipulated X's platform. Media Matters'

actions, not the personal ideologies of its donors, dictated whether it manipulated

X's platform with malicious intent; the various forces influencing those actions are

irrelevant.

While it is possible that some relevant information could be gathered from a

sub-set of the discovery request, the discovery request should still be

"appropriately limited to what might be relevant." *Id.* There is no such limitation

on X's discovery request: it seeks names, addresses, email information, and

communications with all donors to Media Matters. X's discovery request clearly

goes beyond what could be relevant to its claim of platform manipulation.

Therefore, this Court should find that the lower court abused its discretion in

ordering discovery of Media Matters' donor information on the basis that it

violates Rule 26(b)(1)'s relevancy requirement.

**B. Media Matters' First Amendment rights will be infringed upon by forcing production of donor information.**

Courts within the 5th Circuit have held that similar overbroad requests into

the membership and donor lists of organizations invoke serious First Amendment

concerns. In *Young Conservatives Found. v. Univ. of N. Tex.*, the University of

North Texas's request to discover the names and information of the Young

Conservatives Foundation's members was blocked due to its infringement on the

right to freely associate. 2022 WL 2901007, 2 (E.D. Tex., Jan. 11, 2022). This is despite the fact that the Court found "that certain identifying information about Young Conservatives' members is relevant to the issue of associational standing under the broad Rule 26 standard." *Id.* at 3. The Court found that while the University of North Texas's discovery request being relevant and probative to the plaintiff's claim that differences in tuition costs between citizen and non-citizen students were unconstitutional, the First Amendment implications prevented the information from being discoverable. *Id.* In the instant case, the same First Amendment right to association is being threatened, but unlike in *Young Conservatives Found.*, it stems from wholly irrelevant and disproportionate discovery order.

In a similar case in *Sierra Club v. Energy Future Holdings Corp.*, the district court blocked the defendant's attempt to discover the names of members of Sierra Club, an environmental non-profit, who lived near its power plant because it violated Sierra Club members' right to free association. 2013 WL 12244352, 3 (E.D. Tex., Dec. 30, 2013). The court in *Sierra Club* found that compelled disclosure of a member list could expose those members to "economic reprisal, loss of employment, threat of physical coercion, [or] other manifestations of public

hostility." *Id.*[39] Here, Media Matters' donors' right to free association is being threatened, as the release of their personal information may incite doxing, online harassment, and loss of employment. This is no theoretical concern as Elon Musk has repeatedly stated that he seeks to go after donors of organizations critical of X Corp..

X claims that a protective order is enough to mollify any concerns about reprisal against Media Matters' donors; however, when the district court in *Sierra Club* was confronted with the same argument, it was "not convinced the protective order would insulate Sierra Club's members against the risk of public disclosure." *Id.* at 4. Here, Media Matters' donors face the same, or even greater risks, from public disclosure. Elon Musk has directly threatened to "go after" the donors of a media organization that criticized X previously.[40] The risks to Media Matters' donors from public disclosure are substantial enough to warrant denial of X's discovery request into Media Matters' donor information, and the broadcasted

---

[39] The risk of threats against donors is no mere hypothetical. Past targets of Elon Musk's ire, such as X's former head of Trust and Safety, Yoel Roth and his family, had to flee their homes in terror due to a deluge of violent death threats made against them after Musk "appeared to endorse a tweet that baselessly accused Roth of being sympathetic to pedophilia." Donie O'Sullivan, *Former Top Twitter Official Forced to Leave Home Due to Threats amid 'Twitter Files' Release | CNN Business*, CNN (December 12, 2022), https://www.cnn.com/2022/12/12/tech/twitter-files-yoel-roth/index.html.

[40] *See supra note 13.*

animus against the organization from X's majority shareholder demonstrate that a protective order may not be enough to guard against these risks. Elon Musk has posted about his animus towards Media Matters several times on X, claiming that the organization is "pure evil" and supporting content suggesting that Media Matters' founder was "the most craven, deceitful, and amoral scumbag DC politics has ever seen."[41]

These fears of retribution against donors involved in legal actions are not isolated to the parties. Judge Edith Jones, in a public comment, expressed deep concerns about the chilling effect that mandatory disclosure of donors for amicus briefs would have on amicus brief filing, a critical form of advocacy and exercise of freedom of speech.[42] Judge Jones specifically points to concerns over "dox[xing]" and "harass[ment]" of donors and pointed to *NAACP v. Alabama*, 357 U.S. 449 (1958), as establishing First Amendment protections from compelled disclosure of donors.[43] These very same concerns apply to compelled disclosure of

---

[41] Elon Musk (@elonmusk), *Media Matters is pure evil*, X (Nov. 20, 2023, 12:56 PM), https://x.com/elonmusk/status/1726660773286748561 [https://perma.cc/4GJH-PK46]

[42] Judge Edith Jones, U.S. Court of Appeals for the Fifth Circuit, The Continued Independence of the Judiciary, Panel at the 2024 Federalist Society National Lawyers Convention (Nov. 14, 2024), available at https://www.youtube.com/live/-DBl0vUV0ak.

[43] *Id.*

news and media organizations, like Media Matters. Allowing these tactics would have dire implications for free expression by threatening to silence dissent and discourage public discourse.[44]

Overall, the infringement on Media Matters' First Amendment right to free speech, freedom of the press, and its donors' right to free association resulting from the discovery of Media Matters' donor lists, together with the irrelevancy and disproportionality of the discovery order, constitutes an abuse of discretion by the district court and necessitates reversal.

## IV.    CONCLUSION

If allowed to stand, the lower court's ruling would substantially chill the speech of all organizations likely to be targeted by rich and powerful persons as well as large corporations. For the foregoing reasons, *Amicus* respectfully urge this Court to reverse the district court's order.[45]

---

[44] *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021) (finding that "First Amendment freedoms need breathing space to survive" and it is best to avoid even the "risk of a chilling effect").

[45] Amicus curiae thanks the Cyberlaw Clinic students Cory Zayance, Felipe Lobo Koerich, and Kareena Satia for their valuable contributions to this brief.

Dated: December 9, 2024                    Respectfully submitted,

                                            /s/ Alejandra Caraballo
                                           Alejandra Caraballo
                                           Harvard Cyberlaw Clinic
                                           1557 Massachusetts Ave
                                           Lewis Center, 4th Fl
                                           Cambridge, MA 02138
                                           (617) 384-8511
                                           acaraballo@law.harvard.edu
                                           *Counsel* for Amicus Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to the Fed. R. App. P. 29(a)(4)(G), I hereby certify that:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b) and Fifth Circuit Rule 32-2 because it contains 6370 words as calculated by the word count feature of Microsoft Word 365, excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirement of Fed. R. App. P. 32(a)(6) because it uses 14-point proportionally spaced Times New Roman font.


Dated: December 9, 2024                Respectfully submitted,

                                       /s/ Alejandra Caraballo
                                       Alejandra Caraballo

                                       *Counsel* for Amicus Curiae

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that on December 9, 2024, I electronically filed the foregoing Brief of *Amicus Curiae* with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which effects service upon all counsel of record.

Dated: December 9, 2024                          Respectfully submitted,

/s/ Alejandra Caraballo

Alejandra Caraballo

*Counsel* for Amicus Curiae