No. 20-10900

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

X Corp.,

*Plaintiff–Appellee,*

v.

Media Matters for America, Eric Hananoki, and Angelo Carusone,

*Defendants–Appellants.*

———————————

On appeal from the United States District Court for the
Northern District of Texas — No. 4:23-cv-01175-O

———————————

**BRIEF OF *AMICUS CURIAE* THE KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF
DEFENDANTS–APPELLANTS**

———————————

Scott Wilkens
Alex Abdo
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
scott.wilkens@knightcolumbia.org

## Supplemental Certificate of Interested Persons

The undersigned counsel of record for *amicus curiae* certifies pursuant to Fifth Circuit Rule 29.2 that the following listed persons and entities, in addition to those listed in the Appellants' Certificate of Interested Persons, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus curiae***: The Knight First Amendment Institute at Columbia University is a not-for-profit corporation. It has no parent corporation, and no publicly-held corporation owns 10 percent or more of its stock.

***Counsel for amicus curiae***: Scott Wilkens and Alex Abdo of the Knight First Amendment Institute at Columbia University.

 /s/ Scott Wilkens
Scott Wilkens

*Counsel for Amicus Curiae*

i

## Table of Contents

Table of Authorities ............................................................... iii

Interests of Amicus Curiae ....................................................... 1

Summary of the Argument ........................................................ 2

Argument ................................................................................ 6

I.    X Corp.'s Motion to Compel Disclosure of Media Matters's Donor
      List Raises First Amendment Concerns ....................................... 6

II.   Given the First Amendment Interests at Stake, the District Court
      Erred in Compelling Disclosure of Media Matters' Donor
      Information. ............................................................... 11

      A.    The First Amendment requires civil litigants to make a
            heightened showing before obtaining donor records whose
            disclosure could chill constitutionally protected association. ....... 12

      B.    X Corp.'s discovery requests do not comply with Rule 26,
            particularly in light of the First Amendment insterersts at
            stake. ................................................................ 22

Conclusion ............................................................................. 27

Certificate of Compliance ......................................................... 29

Certificate of Service .............................................................. 30

# Table of Authorities

## Cases

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ................11, 14, 15, 27

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583
    (1st Cir. 1980) ............................................................................23, 24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................15

*Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 21-CV-3161,
    2023 WL 2355891 (N.D. Ga. Mar. 3, 2023) ........................................22

*Cazorla v. Koch Foods of Miss.*, 838 F.3d 540 (5th Cir. 2016) ..............23

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351
    (2021) ....................................................................................25

*Grandbouche v. Clancy*, 825 F.2d 1463 (10th Cir. 1987) ........................4

*Herbert v. Lando*, 441 U.S. 153 (1979) ...................................................24

*Hickman v. Taylor*, 329 U.S. 495 (1947) ...............................................23

*In re Selcraig*, 705 F.2d 789 (5th Cir. 1983) ...........................................21

*Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021) ................25

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 726 F.2d 1150
    (7th Cir. 1984) ..........................................................4, 17, 18, 22

*Media Matters for Am. v. Bailey*, No. 24-CV-147, 2024 WL 3924573
    (D.D.C. Aug. 23, 2024) ................................................................9

*Media Matters for Am. v. Paxton*, No. 24-CV-147, 2024 WL 1773197
    (D.D.C. Apr. 12, 2024) ................................................................9

*Miller v. Transamerican Press*, 621 F.2d 721 (5th Cir. 1980) ...............21

*N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir.
    1989) ....................................................................................4, 22

*N.Y. Times, Co. v. Sullivan*, 376 U.S. 254 (1964) ....................................................7

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)...........................passim

*Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010) ....................4, 19, 20, 22

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)..........................................................12

*Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163 (E.D.N.Y. 1988)......................24

*Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018)..................4, 15, 16

*X Corp. v. Ctr. for Countering Dig. Hate, Inc.*, 724 F. Supp. 3d 921
    (N.D. Cal. 2024)....................................................................................1, 3, 7, 10

*X Corp. v. Media Matters for Am.*, 120 F.4th 190, 194 (5th Cir. 2024)....2, 7, 26, 27

**Statutes**

18 U.S.C. § 1030 ......................................................................................................10

Fed. R. Civ. P. 26 .....................................................................................................23

**Other Authorities**

@AGAndrewBailey, X (Nov. 19 2023), https://perma.cc/2ZKS-
    QZXR .................................................................................................................9

@elonmusk, X (Nov. 18 2023), https://perma.cc/94AA-TE8S ...............................7

@elonmusk, X (Nov. 18 2023), https://perma.cc/CJ9X-TMF5............................3, 7

@elonmusk, X (Nov. 18 2023), https://perma.cc/GVE9-5AES ...............................3

@elonmusk, X (Nov. 19 2023), https://perma.cc/J6AN-QKLZ ...............................9

@StephenM, X (Nov. 19 2023), https://perma.cc/8SVS-2KA5 ...............................9

*About Us*, Media Matters for America (2023), https://perma.cc/ZF58-
    QA6N ..............................................................................................................2, 6

*About*, Center for Countering Digital Hate, https://perma.cc/9KJU-67P3 ........................................................................................................9

*Archives: Networks & Outlets*, Media Matters, https://perma.cc/7343-9PCF ........................................................................................................6

Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity Next to Pro-Nazi Content*, Media Matters for America, (Nov. 16, 2023), https://perma.cc/KPQ3-J3BF .................................................2

Maggie Haberman, et al., *Trump Transition Signals Focus on Deportations as Miller Assumes Influence*, N.Y. Times (Nov. 11, 2024), https://perma.cc/FY68-Q4VF ..................................................9

Mike Wendling, *Twitter and hate speech: What's the evidence?*, BBC (Apr. 12, 2023), https://perma.cc/R4JN-QY9N ..................................................6

Nico Grant, *Election Falsehoods Take Off on YouTube as It Looks the Other Way*, N.Y. Times (Oct. 31, 2024), https://perma.cc/MM8Y-RG7A ........................................................................................................2

Tori Otten, *Elon Musk Says He Wants "Specific Examples" of Hate Speech on Twitter*, The New Republic (Apr. 12, 2023), https://perma.cc/G3F3-X6PU .................................................................6

Willam Melhado, *Ken Paxton announces investigation of media group following Elon Musk's lawsuit*, Texas Tribune (Nov. 20, 2023), https://perma.cc/2LLC-2B3M ..................................................9

## Interests of Amicus Curiae[1]

The Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute") is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

The Institute is particularly committed to illuminating the forces that are shaping public discourse online. It represents journalists and researchers who fear legal liability for their work studying the ways in which the largest social media platforms, including X, influence public discourse. The Institute recently filed an amicus brief in support of a non-profit research organization sued by X Corp. for publishing research critical of the company. Brief for Knight First Amendment Institute et al. as Amici Curiae Supporting Defendants, *X Corp. v. Ctr. for Countering Dig. Hate, Inc.*, 724 F. Supp. 3d 921 (N.D. Cal. 2024) (No. 23-cv-03836).

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this *amicus* brief.

## Summary of the Argument

Media Matters for America is a non-profit research organization that monitors and reports on what it calls "conservative misinformation" in the U.S. media, including X Corp. and other social media platforms.[2] Its research and reporting have been cited by government agencies, congressional committees, politicians from both parties, researchers, and academics.[3] As relevant to this lawsuit, Media Matters published an article on November 16, 2023 reporting that ads on X had appeared next to pro-Nazi content.[4] Displeased with that reporting, X Corp. sued Media Matters, alleging that its reporting was "false and malicious" and constituted "business disparagement and tortious interference with X Corp.'s business relationships" with advertisers.[5] In discovery, X Corp. sought—and obtained—an order requiring Media Matters to turn over a host of donor-related information, including the names and addresses of every Media Matters donor.[6]

---

[2] *About Us*, Media Matters for America (2023), https://perma.cc/ZF58-QA6N; ROA.1606.

[3] ROA 1738–39; Nico Grant, *Election Falsehoods Take Off on YouTube as It Looks the Other Way*, N.Y. Times (Oct. 31, 2024), https://perma.cc/MM8Y-RG7A.

[4] Eric Hananoki, *As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity Next to Pro-Nazi Content*, Media Matters for America, (Nov. 16, 2023), https://perma.cc/KPQ3-J3BF.

[5] ROA.248.

[6] *X Corp. v. Media Matters for Am.*, 120 F.4th 190, 194 (5th Cir. 2024).

X Corp.'s discovery demand and the order it has obtained requiring Media Matters to disclose its complete list of donors and their street addresses raise significant First Amendment concerns. Indeed, they appear designed to punish Media Matters for publishing speech critical of the company. This is clear from Elon Musk's statement, posted on X a few days before this lawsuit was filed, that "X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company. . . ,"[7] which he followed with: "Their board, their donors, their network of dark money, all of them."[8] It is also clear from X Corp.'s litigation strategy, which is focused on Media Matters's donors. And it is clear from legal actions that X Corp. has taken against other organizations that have published reports critical of its approach to moderating the content on its platform. In one of those suits, a district court remarked in granting the motion to dismiss that "[t]his case is about punishing the Defendants for their speech."[9]

The First Amendment prevents the abuse of legal process to suppress constitutionally protected association. In *NAACP v. Alabama*, the Supreme Court recognized a qualified First Amendment associational privilege that protected the NAACP from complying with a state court order that required the organization to

---

[7] @elonmusk, X (Nov. 18 2023), https://perma.cc/GVE9-5AES.

[8] @elonmusk, X (Nov. 18 2023), https://perma.cc/CJ9X-TMF5.

[9] F. Supp. 3d at 955.

disclose its membership list to the Alabama attorney general.[10] Several circuit courts, including this Court, have relied on *NAACP v. Alabama* in recognizing a qualified First Amendment privilege that protects civil litigants from court orders compelling the disclosure of sensitive associational information that would chill constitutionally protected activity, without the requesting party first making a heightened showing of need.[11] That rule applies here, because Media Matters has demonstrated that enforcement of X Corp.'s discovery requests may chill its donors from continuing to associate with Media Matters by subjecting them to harassment and intimidation.

While there is some uncertainty about the precise showing that X Corp. must make to overcome the qualified privilege invoked by Media Matters, the Court need not address that question in this case, because X Corp.'s discovery requests fail under even Rule 26. In a case that implicates First Amendment interests like this one, district courts must apply Rule 26's requirements strictly, and they must manage discovery in a way that minimizes the undue interference with constitutionally protected rights. The district court in this case failed to do so in two ways.

---

[10] *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

[11] *See Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018); *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1354–55 (2d Cir. 1989); *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 726 F.2d 1150 (7th Cir. 1984), *rev'd on other grounds*, 470 U.S. 373 (1985); *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010); *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987).

First, the district court failed to carefully apply Rule 26's requirement of relevance. X Corp. claims that the donor information it seeks is relevant to personal jurisdiction, but that appears to be incorrect. Even if Media Matters has donors in Texas, they would not be relevant to specific jurisdiction because X Corp.'s business tort claims do not arise from or relate to those donors. Instead, they arise from the November 16, 2024 report. Furthermore, although X Corp. asserts that the donor information is relevant to Media Matters's mental state, X Corp. has not explained how, other than providing wild speculation.

Second, even if Media Matters's donor list were relevant to X Corp.'s claims, the district court failed to consider alternatives to disclosure that would prevent unnecessary intrusion into Media Matters donors' constitutionally protected associations. For example, it failed to consider the possibility of *in camera* review of the list of donors, to see whether any are in fact in Texas and whether there is even a plausible claim that their identities would be relevant to personal jurisdiction or to Media Matters's mental state. In short, the district court erred in granting the motion to compel, because X Corp.'s document requests are plainly impermissible under Rule 26, when their lack of relevance is weighed against the potential harm of disclosure to the freedom of association of Media Matters's donors.

For these reasons, the Court should reverse the district court's order.[12]

**Argument**

**I.     X Corp.'s Motion to Compel Disclosure of Media Matters's Donor List Raises First Amendment Concerns.**

Media Matters provides research and reporting on many news outlets and social media platforms, including X, with the goal of "comprehensively monitoring, analyzing, and correcting conservative misinformation."[13] In the months after Elon Musk acquired X, many news outlets and research organizations, including Media Matters, began reporting on a marked increase in hate speech and other kinds of objectionable content on the platform.[14] Musk disputed that there was any increase in hate speech and began to retaliate against journalists and research organizations who said otherwise. For example, and as discussed further below, X Corp. sued the Center for Countering Digital Hate (CCDH) in July 2023, after CCDH published reports critical of the company, including "Toxic Twitter," a report claiming that X Corp. was generating tens of millions of dollars in advertising revenue from

---

[12] The Knight Institute does not address other issues in this appeal, including the Court's jurisdiction and whether Media Matters waived its First Amendment objection to the document requests at issue.

[13] *About Us*, *supra* note 1; *Archives: Networks & Outlets*, Media Matters, https://perma.cc/7343-9PCF.

[14] Mike Wendling, *Twitter and hate speech: What's the evidence?*, BBC (Apr. 12, 2023), https://perma.cc/R4JN-QY9N; Tori Otten, *Elon Musk Says He Wants "Specific Examples" of Hate Speech on Twitter*, The New Republic (Apr. 12, 2023), https://perma.cc/G3F3-X6PU.

previously-banned accounts that Musk had reinstated, "including neo-Nazis, white supremacists, misogynists and spreaders of dangerous conspiracy theories." 724 F. Supp. 3d at 959–61. The district court threw out the complaint, which the court said was "unabashedly and vociferously about one thing, . . . punishing [CCDH] for [its] speech." *Id.* at 955. The First Amendment broadly protects the right of private individuals, organizations, and companies to criticize one another. *N.Y. Times, Co. v. Sullivan*, 376 U.S. 254 (1964).

X Corp.'s goal in filing this lawsuit is of a piece with these earlier efforts—to punish Media Matters and its donors for research and reporting critical of X. Elon Musk made this clear just two days before this lawsuit was filed, posting on X that "[t]he split second court opens on Monday, X Corp. will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company . . . Their board, their donors, their network of dark money, all of them . . ."[15] and "[t]he discovery and depositions will be glorious to behold."[16] Several weeks later, Musk again made clear that he was going after "not just [Media Matters] but anyone funding that organization. I want to be clear about that[;] anyone funding that organization, will be, we will pursue them."[17] The discovery requests

---

[15] @elonmusk, *supra* note 8.

[16] @elonmusk, X (Nov. 18 2023), https://perma.cc/94AA-TE8S.

[17] *X Corp. v. Media Matters for Am.*, 120 F.4th 190, 199 (5th Cir. 2024).

at issue are integral to this strategy of retribution, because X Corp. cannot punish Media Matters donors without first finding out who they are.

The factual record in this case shows that Musk's threats of retaliation against Media Matters and its donors are likely to have strong deterrent effects on their continued association. After the Free Beacon posted an alleged "leaked donor list" of Media Matters's "five largest contributors"—and after Elon Musk reposted the list—X users posted a barrage of threats and insults directed at these donors, calling for them to be arrested, tried for treason, and executed.[18] Several donors and potential donors have expressed concerns for their personal privacy and safety, and donations to Media Matters have decreased.[19] Media Matters fears that the prospect of their identities being disclosed will cause current donors to withdraw their support and will discourage new donors.[20]

X Corp. is not the only powerful entity seeking to retaliate against Media Matters and its donors for reporting critical of X. The day after Musk threatened a "thermonuclear lawsuit," Stephen Miller, a senior adviser to President Donald Trump in his first term and currently President-elect Trump's choice for deputy chief of policy, implicitly called on "conservative" state attorneys general to investigate

---

[18] ROA.1611–14.

[19] ROA.1614–15.

[20] ROA.1615.

Media Matters for its reporting on X.[21] Musk responded with encouragement,[22] and within hours, Missouri Attorney General Andrew Bailey replied, "[m]y team is looking into this matter."[23] On the following day—the same day X Corp. filed this lawsuit—Texas Attorney General Ken Paxton announced that he, too, was opening an investigation into Media Matters's reporting about X.[24] Both Bailey and Paxton issued civil investigative demands seeking a broad range of Media Matters's documents, including donor records.[25] A federal district court has enjoined enforcement of the CIDs on First Amendment grounds, but Bailey and Paxton have appealed those rulings to the D.C. Circuit.[26]

X Corp.'s litigation strategy in this case is similar to the one it used against the Center for Countering Digital Hate (CCDH), mentioned above.[27] X Corp. sued

---

[21] @StephenM, X (Nov. 19 2023), https://perma.cc/8SVS-2KA5; Maggie Haberman, et al., *Trump Transition Signals Focus on Deportations as Miller Assumes Influence*, N.Y. Times (Nov. 11, 2024), https://perma.cc/FY68-Q4VF.

[22] @elonmusk, X (Nov. 19 2023), https://perma.cc/J6AN-QKLZ ("Interesting. Both civil and criminal . . .")

[23] @AGAndrewBailey, X (Nov. 19 2023), https://perma.cc/2ZKS-QZXR.

[24] Willam Melhado, *Ken Paxton announces investigation of media group following Elon Musk's lawsuit*, Texas Tribune (Nov. 20, 2023), https://perma.cc/2LLC-2B3M.

[25] *Media Matters for Am. v. Paxton*, No. 24-CV-147, 2024 WL 1773197, 6–7 (D.D.C. Apr. 12, 2024); *Media Matters for Am. v. Bailey*, No. 24-CV-147, 2024 WL 3924573, 3–5 (D.D.C. Aug. 23, 2024).

[26] *Id.*; *Media Matters for Am. v. Paxton*, 5th Cir. Nos. 24-7059, 24-7141.

[27] *About*, Center for Countering Digital Hate, https://perma.cc/9KJU-67P3.

CCDH and unnamed funders and supporters for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and state law, alleging that the defendants "scraped" data from X Corp. and used it to "create[] 'faulty narratives regarding X Corp. and the X Service with the express goal of seeking to harm X Corp.'s business by driving advertisers away from the platform.'" 724 F. Supp. 3d at 956, 960–61.

Before X Corp. could seek discovery of the names of CCDH's supporters and funders, the district court granted CCDH's motion to dismiss, largely on First Amendment grounds, holding that X Corp. was impermissibly using state law breach of contract and tort claims to recover defamation-type damages without satisfying the stricter First Amendment standards applicable to defamation claims. *Id.* at 973–77, 986–87. Notably, in denying X Corp. leave to amend its complaint, the district court observed:

> "X Corp. has brought this case in order to punish CCDH for CCDH publications that criticized X Corp.—and perhaps in order to dissuade others who might wish to engage in such criticism. . . . Although X Corp. accuses CCDH of trying 'to censor viewpoints that CCDH disagrees with,' it is X Corp. that demands 'at least tens of millions of dollars' in damages—presumably enough to torpedo the operations of a small nonprofit—because of the views expressed in the nonprofit's publications."

*Id.* at 981.

**II.    The District Court Erred in Compelling Disclosure of Media Matters's Donor Information.**

The Supreme Court has held that the First Amendment provides a qualified privilege against the compelled production of information whose disclosure would chill constitutionally protected association. In its seminal decision in *NAACP v. Alabama*, for example, it reversed a civil contempt order against the NAACP for refusing to disclose a list of its members to the attorney general of Alabama, because it was "apparent" that disclosure would chill the organization's associations and because the attorney general had not demonstrated a sufficient need for the list. 357 U.S. at 462–66. And in *Americans for Prosperity Foundation v. Bonta*, it held unconstitutional a California regulation that required charitable organizations to disclose their donors to the state's attorney general, because the disclosures risked chilling protected associations without sufficient justification or tailoring. 594 U.S. 595, 618 (2021).

While the Supreme Court has yet to consider whether this privilege applies in the context of private litigation, this Court and other courts have recognized that it does. As explained below, this Court should give effect to that privilege here, because the compelled disclosure of Media Matters's list of donors would chill constitutionally protected association. The Court need not resolve, however, what precise level of scrutiny the First Amendment requires X Corp. to satisfy before invoking the coercive power of the courts to force disclosure of Media Matters's

11

donors. That is because X Corp.'s discovery demands fail even Rule 26, which courts are required to apply scrupulously when discovery requests burden constitutional rights.

### A. The First Amendment requires civil litigants to make a heightened showing before obtaining donor records whose disclosure could chill constitutionally protected association.

X Corp.'s use of civil discovery to seek retribution against Media Matters's donors threatens First Amendment associational interests. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). And as the Court has explained, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama*, 357 U.S. at 462. For that reason, "compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective restraint on freedom of association." *Id.*

*NAACP v. Alabama* is the foundational case in which the compelled disclosure of an organization's membership information was struck down based on the chilling effect it would have on the organization's members. In that case, the Alabama attorney general used civil discovery tactics as part of a broader effort to

oust the NAACP from the state. *Id*. at 451–52. He sued the NAACP in state court alleging that it had failed to register with the Alabama secretary of state, as foreign corporations were required to do in order to conduct business in the state. *Id.* In discovery, the attorney general sought and obtained a court order requiring the NAACP to disclose its list of Alabama members. *Id*. When the NAACP failed to comply, the state court held it in civil contempt. *Id.*

Based on the NAACP's "uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members ha[d] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," the Supreme Court found that the trial court's discovery order was "likely to affect adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *Id.* at 462–63. "It is hardly a novel perception," the Court wrote, "that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective a restraint on freedom of association . . . ." *Id.* at 462.

Alabama argued that the reprisals perpetrated against the NAACP's members were the result of "private community pressures," rather than state action, but the Supreme Court rejected the argument, noting that "it is only after the initial exertion of state power represented by the production order that private action takes hold." *Id.* at 463. In short, the disclosure order infringed the NAACP's freedom to associate

because the "fear of exposure of their beliefs shown through their associations and . . . the consequences of this exposure" threatened to "induce members to withdraw from the Association and dissuade others from joining it." *Id.* at 462–63.

The Supreme Court proceeded to analyze whether the state's interest in obtaining the NAACP's membership records was "sufficient to justify" the burden imposed by the disclosure order. *Id.* at 463. It concluded that the compelled disclosure of the NAACP's membership list did not have a "substantial bearing" on the state's legitimate investigatory interests, because the NAACP had already admitted that it was operating in the state, had offered to comply in all respects with the qualification statute, and had already turned over all records subject to the disclosure order except its membership lists. *Id.* at 464. The Court accordingly struck down the contempt order, concluding that the state had "fallen short of showing a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have." *Id.* at 466.

Since *NAACP v. Alabama*, the Supreme Court's compelled disclosure cases have involved challenges to statutes or regulations, rather than trial court discovery orders. *See Bonta*, 594 U.S. at 607–08 (collecting cases). Nevertheless, these cases have relied heavily on *NAACP v. Alabama*'s reasoning, because compelled disclosures can threaten freedom of association whether they take the form of legislative, executive, or judicial acts. *Cf.* 357 U.S. at 463 ("It is not of moment that

14

the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.").

Starting with *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam), the Supreme Court has applied "exacting scrutiny" in compelled disclosure cases, in a wide variety of statutory and regulatory contexts. *See Bonta*, 594 U.S. at 607–08. In *Bonta*, the Supreme Court's most recent compelled disclosure case, the Supreme Court struck down a state regulation requiring all charities operating in California to disclose their largest donors. *Id.* at 618. However, the Court's fractured opinions have resulted in some uncertainty about the contours of "exacting scrutiny" and the circumstances in which it applies.

Every circuit to have considered the question—including this one—has applied *NAACP v. Alabama*'s qualified First Amendment associational privilege to civil discovery orders.[28] In *Whole Woman's Health*, this Court addressed a civil discovery demand for the internal communications of a religious organization. 896 F.3d at 366. The plaintiffs in the case—several private healthcare providers—challenged state regulations governing the disposal of fetal remains. *Id.* at 364–65. In discovery, the plaintiffs issued a third-party subpoena to the Texas Conference of Catholic Bishops (TCCB) for its internal communications regarding public testimony it gave in support of the law. *Id.* at 365–66. The plaintiffs claimed that

---

[28] *See supra* n.11.

15

they needed the records to cross-examine TCCB's executive director, who was listed as a trial witness for the defendants. *Id.* The district court denied TCCB's motions to quash the subpoena. *Id.* at 366–67.

In reversing the district court, this Court recognized a qualified First Amendment associational privilege protecting the internal communications of religious organizations like TCCB. *Id.* at 372–74. This Court appeared to apply "exacting scrutiny," as modified by the Ninth Circuit in *Perry v. Schwartzenegger*, which is discussed below. *Id.*[29] The Court recounted in detail how TCCB's associational interests would be "chilled" by enforcement of the subpoena, including impaired relationships "with other Catholic ministries whose communications it was forced to disclose," an unwillingness on the part of TCCB bishops and staff to "engag[e] in other public policy activities," and a reduced "ability to conduct frank internal dialogue and deliberations." *Id.* at 373. The Court did not, however, finally resolve whether the district court's discovery order violated the First Amendment privilege. *Id.* at 374. Invoking the doctrine of constitutional avoidance, the Court turned to Rule 45(d) of the Federal Rules of Civil Procedure and held that the district court abused its discretion in applying that rule. *Id.* at 376.

---

[29] The Court did not use the term "exacting scrutiny," but it referred to "*Perry*'s balancing test" and its various elements. *Id.*

16

In *Marrese v. American Academy of Orthopaedic Surgeons*, the Seventh Circuit considered a discovery demand issued to a private medical association for its membership files. 726 F.2d at 1151. The plaintiffs in the case—two orthopedic surgeons who were denied membership in the Academy—brought a federal antitrust suit, claiming that that the Academy was a monopoly that had refused to admit the plaintiffs as members because they competed too vigorously with the Academy's existing members. *Id*. In discovery, the plaintiffs sought "all [Academy] files relating to all denials of membership applications" for a ten-year period. *Id.* at 1151–52. The district court granted the plaintiffs' motion to compel and, when the Academy refused to comply, held the Academy in criminal contempt. *Id.* at 1152.

The Seventh Circuit reversed the contempt judgment. Writing for the en banc court and relying on *NAACP v. Alabama*, Judge Posner recognized that the case implicated First Amendment interests, "which the discovery sought by the plaintiffs would impair and which differentiates this case from the usual antitrust case, where discovery is sought of invoices or salesmen's reports or the minutes of a board of directors' meeting." *Id.* at 1159. Judge Posner observed that the "American Academy of Orthopaedic Surgeons is not the NAACP, but neither is it a country club or a trade association; it is a professional association and a forum for exchanges of information about surgical techniques and related matters of substantial public interest." *Id.* The court found that "[i]f the Academy has to reveal its membership

17

files, members may be reluctant to offer candid evaluations of applicants, and the atmosphere of mutual confidence that encourages a free exchange of ideas will be eroded." *Id.* at 1159–60.

The court acknowledged that "on the other side of the coin, barring the plaintiffs . . . from all access to the membership files would probably make it impossible for them to prove their antitrust case," but noted that "there were various devices that the district judge could have used to reconcile the parties' competing needs." *Id.* at 1160. For example, the judge could have reviewed a sample of the Academy's membership files *in camera* to see if there was evidence of any anticompetitive purpose attributable to the Academy. *Id.* at 1160. Alternatively, he could have used Rule 26(d) to sequence discovery and require the plaintiffs to conduct all non-sensitive discovery first and then make a showing that the membership files were necessary for the plaintiffs to prove their case. *Id.* at 1161. Ultimately, the court concluded that "[t]here are so many ways in which [the district judge] could have prevented the plaintiffs from abusing the discovery process, without denying them any information essential to developing their case, that we are left with the firm conviction that the discovery order he issued, when he issued it, was erroneous." *Id.* at 1162.

In *Perry v. Schwarzenegger*, the Ninth Circuit addressed a discovery demand for the internal campaign communications of the private individuals who proposed

18

and campaigned for Proposition 8, which amended the California Constitution to provide that only marriage between a man and a woman is valid or recognized in California. 591 F.3d at1152–53. In the case, two same-sex couples sued California state officials alleging that Proposition 8 violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Id.* at 1152. After the California Attorney General declined to defend the constitutionality of Proposition 8, the individuals who proposed and campaigned for it—Proposition 8's "proponents"—intervened to defend the suit. *Id.* In discovery, the plaintiffs sought the proponents' internal campaign communications, and the district court ordered that they be produced. *Id.* at 1153–54.

On appeal, the Ninth Circuit recognized a qualified First Amendment associational privilege against the compelled disclosure of internal campaign communications. *Id.* at 1160. Employing a burden-shifting framework, the court found that the proponents had made a *prima facie* showing that the compelled disclosure of internal campaign communications "would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression." *Id.* at 1163. In doing so, the court relied on the declaration of a Proposition 8 proponent stating that he would "be less willing to engage in [campaign] communications knowing that my private thoughts on how to petition the government and my private

political and moral views may be disclosed simply because of my involvement in a ballot initiative campaign," and that he "would have to seriously consider whether to even become an official proponent again." *Id.*

The court next asked whether the plaintiffs had demonstrated a need for the internal campaign communications sufficient to justify the deterrent effect on freedom of association. *Id.* at 1161. In doing so, the court applied a version of the "exacting scrutiny" standard, modified to account for the civil discovery context. Under that modified standard, "the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)"—that "the request [is] carefully tailored to avoid unnecessary interference with protected activities," and that "the information [is] otherwise unavailable." *Id.* at 1161. The court found that although the plaintiffs' discovery requests were relevant under Rule 26, they were not "highly relevant" as required by "exacting scrutiny," because the plaintiffs could "obtain much of the information they seek from other sources, without intruding on protected activities." *Id.* at 1164. The court concluded that the plaintiffs' interest in disclosure did not outweigh the harm to First Amendment interests, because "[t]he information plaintiffs seek is attenuated from the issue of voter intent, while the intrusion on First Amendment interests is substantial." *Id.* at 1165.

Collectively, these cases demonstrate that the First Amendment provides a qualified privilege against the use of civil discovery to compel the production of information whose disclosure would chill constitutionally protected association. Although there is some uncertainty as to the standard that this Court applies (or that other courts apply) once the threshold for invocation of the privilege is met, the party seeking discovery must demonstrate, at the very least, a heightened need for the information at issue and some measure of tailoring, and the district court must consider alternatives designed to minimize the risk of chill.

X Corp. attempts to distinguish these cases and avoid the qualified First Amendment privilege by arguing that the privilege does not apply in civil litigation between private parties, because there is no state action. It is true that the Supreme Court has not expressly addressed this question, but this Court effectively rejected X Corp.'s argument in *Whole Woman's Health*.[30] And for good reason: the logic of the Supreme Court's decision in *NAACP v. Alabama* makes clear that a judicial order enforcing a discovery request constitutes state action, whether or not the litigants are private parties. *See* 357 U.S. at 463. Although X Corp. identifies the state action in that case as the Alabama Attorney General filing suit and seeking disclosure of the NAACP's membership list, the Supreme Court identified the state action as the state

---

[30] X Corp.'s argument is also inconsistent with this Court's decision in *Miller v. Transamerican Press*, which recognized a qualified First Amendment reporter's privilege. 621 F.2d 721, 725–27 (5th Cir. 1980).

court order compelling disclosure. *Id.* (explaining that state action, not "private community pressures," was responsible for the chilling effect on NAACP members, because "it is only after the initial exertion of state power represented by the production order that private action takes hold"); *see also id.* ("It is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.").

The Second, Seventh, Ninth, and Tenth Circuits and numerous federal district courts have likewise rejected the state action argument that X Corp. makes here, interpreting the qualified First Amendment associational privilege recognized in *NAACP v. Alabama* to apply to "discovery orders 'even if all of the litigants are private entities.'" *Perry*, 591 F.3d at 1160 (quoting *Grandbouche*, 825 F.2d at 1466; *see also, e.g.*, *Marrese*, 726 F.2d at 1159; *Terry*, 886 F.2d at 1354–55; *Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 21-CV-3161, 2023 WL 2355891, at *4 (N.D. Ga. Mar. 3, 2023).

**B.    X Corp.'s discovery requests fail any level of heightened scrutiny because they fail to comply even with Rule 26, particularly in light of the First Amendment interests at stake.**

X Corp.'s discovery demands fail any level of heightened scrutiny because they fail to comply even with Rule 26. As many courts, including this Court, have recognized, Rule 26 has added bite—even in the absence of a claim of privilege—

when the discovery sought implicates constitutional rights or greater societal interests. *See Cazorla v. Koch Foods of Miss.*, 838 F.3d 540, 555 (5th Cir. 2016) (observing that courts applying Rule 26 "also weigh relevant public interests"). That is the case here, and it may make no practical difference whether the Court applies a qualified First Amendment privilege or takes First Amendment interests into account directly under Rule 26. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595 (1st Cir. 1980) (referring to the difference between the two as "largely a question of semantics").

Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), and that courts may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," such as by "forbidding the disclosure or discovery" or limiting its scope. *Id.* 26 (c)(1). As the Supreme Court observed, "discovery, like all matters of procedure, has ultimate and necessary boundaries," and may not be "conducted in bad faith or in such a manner as to annoy, embarrass or oppress the person subject to the inquiry." *Hickman v. Taylor*, 329 U.S. 495, 507–08 (1947). "And as Rule 26(b) provides, further limitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege." *Id.*

Courts applying Rule 26 "have frequently denied or limited discovery absent claims of formal privilege, based upon . . . the societal interests at stake," including First Amendment interests. *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 169–70 (E.D.N.Y. 1988) (cleaned up); *see also, e.g.*, *Globe Newspaper Co.*, 633 F.2d at 596. These courts often rely on Justice Powell's concurrence in *Herbert v. Lando*, a defamation case in which the Supreme Court rejected an absolute First Amendment privilege barring a defamation plaintiff from inquiring into the "editorial process" of a publisher of allegedly defamatory material. 441 U.S. 153, 157 (1979). The Court denied an absolute privilege because it viewed the "conduct and state of mind of the defendant" as "essential to proving liability" in defamation cases. *Id.* at 160. Instead, the Court urged district courts to "firmly appl[y]" the relevancy requirement of Rule 26(b)(1), and to exercise "their power to restrict discovery" under Rule 26(c)(1). *Id.* at 177.

In his concurrence in *Herbert*, Justice Powell emphasized that "when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated." *Id.* at 179 (Powell, J., concurring). Thus, "the district court must ensure that the values protected by the First Amendment, though entitled to no constitutional privilege in a case of this kind, are weighed carefully in striking a proper balance." *Id.* at 180.

Applying Rule 26 scrupulously, X Corp.'s discovery demands fail. The company claims that it needs the identities and addresses of Media Matters donors to establish personal jurisdiction and because the information is "probative of Defendants' motive, intent, and malice."[31] That is far fetched. To establish specific jurisdiction, X Corp. must show that Media Matters has contacts in Texas that are Media Matters's "own choice and not random, isolated, or fortuitous," and that X Corp.'s claims "arise out of or relate to" those purposeful contacts. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 359 (2021) (cleaned up). Even assuming that Media Matters has donors in Texas and that they qualify as purposeful contacts, it is difficult to see how those contacts relate to X Corp.'s claims for business disparagement or tortious interference. Those claims arise from Media Matters's November 16, 2023 article. They neither stem from nor relate to Media Matters's donors or their citizenship. *See, e.g.*, *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 319 & n.5 (5th Cir. 2021) (concluding same with respect to libel claim); *id.* at 321 ("Johnson's libel claim arises from the story declaring him a white-nationalist Holocaust denier. It does not stem from or relate to HuffPost's ads or the citizenship of those placing them.").

---

[31] ROA.1713.

X Corp. fares no better in asserting that information about Media Matters donors is relevant to "motive, intent, and malice."[32] Before the district court, X Corp. offered only pure speculation in support of this assertion—that a donor could have written "a large check to Media Matters conditioned on publishing one or more articles defaming X," or that Media Matters could have "solicited donations from individuals publicly known to be antagonistic to X or Elon Musk immediately before or after the publication of defamatory articles."[33] For good reason, X Corp. made no effort to connect these hypotheticals to its claimed need for the names and street addresses of every Media Matters donor.[34] This Court was correct in "doubt[ing] that X Corp. needs the identity [or the full residential addresses] of Media Matters's every donor, big or small, to advance its theories." 120 F.4th at 199.

As described above, and as this Court agreed in granting the stay, "Media Matters and its donors would bear a heavy burden if Media Matters had to release this information," because "[i]t could enable others to harass or intimidate Media Matters or its donors." *Id.* The Court may have been referring to private interests, but the burden here is also on First Amendment associational interests. When the

---

[32] *Id.*

[33] ROA.1714.

[34] *Id.* The district court stated that the donor information goes to Media Matters's mental state and thus the heart of the case, but it, too, made no effort to explain itself. ROA.2166.

lack of relevance of the donor information is weighed against the First Amendment interests at stake, the outcome under Rule 26 is clear. X Corp. is not entitled to disclosure of the names and street addresses of Media Matters donors.[35]

Even if X Corp. could demonstrate that some donor information is relevant to its claims, however, the district court still erred in failing to reasonably manage the intrusiveness of the requests. As discussed above, in *Marrese*, Judge Posner identified several ways in which district courts can minimize the risk that intrusive discovery will chill constitutionally protected association. *See* Part II.A *supra*. In this case, the district court should have, at the very least, considered the possibility of *in camera* review to determine whether any of Media Matters's donors reside in Texas, whether any of those that do could plausibly be relevant to X Corp.'s theory of personal jurisdiction, and whether the identities of any of the donors are relevant to Media Matters's state of mind.

## Conclusion

*Amicus* asks this Court to reverse the district court's order compelling Media Matters to produce donor-related documents.

---

[35] The protective order agreed to by the parties, even if issued by the district court, would not mitigate the First Amendment concerns. As the Supreme Court has explained, "disclosure requirements can chill association 'even if there is no disclosure to the general public.'" *Bonta*, 594 U.S. at 616 (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960)). Media Matters is "reasonably concerned" that the disclosure of sensitive donor information could result in the harassment or intimidation of itself or its donors. *See X Corp.*, 120 F.4th at 199.

December 9, 2024                         Respectfully submitted,

                                      /s/ Scott Wilkens
                                     Scott Wilkens
                                     Alex Abdo
                                     Knight First Amendment Institute at
                                        Columbia University
                                     475 Riverside Drive, Suite 302
                                     New York, NY 10115
                                     (646) 745-8500
                                     scott.wilkens@knightcolumbia.org

                                     *Counsel for Amicus Curiae*

**Certificate of Compliance**

This brief complies with: the type-volume limitation of Fed. R. App. P. 29(a)(5), 32(a)(7)(B)(i), and 32(g)(1), because it contains 6,490 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (14-point Times New Roman) and is double-spaced.

December 9, 2024                              /s/ Scott Wilkens
                                             Scott Wilkens

                                             *Counsel for Amicus Curiae*

**Certificate of Service**

I hereby certify that on December 9, 2024, I caused the foregoing Brief of the Knight First Amendment Institute at Columbia University as *Amicus Curiae* in Support of Defendants-Appellants to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

December 9, 2024                              /s/ Scott Wilkens
                                              Scott Wilkens

                                              *Counsel for Amicus Curiae*